THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| ROBERT MCCANN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 12-1535 (JBS/JS) |
| | : | |
| KENNEDY UNIVERSITY | : | |
| HOSPITAL, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| _____ | : | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the "Motion for Sanctions Due to Defendant['s] Spoliation of Emergency Room Video Tapes" ("Motion") filed by pro se plaintiff, Robert McCann. [Doc. No. 62].[1] Plaintiff requests that the Court sanction defendant Kennedy University Hospital for "intentionally or inadvertently" destroying videotapes that recorded defendant's emergency room lobby on the night plaintiff claims to have been mistreated by defendant's staff. Id. at 2. Plaintiff argues that defendant "knew or should have known that the [video]tapes were discoverable material" and that there was

---

[1] In a separate Order, the Court will address plaintiff's request for monetary sanctions due to the late production of defendant's documents.

an "actual withholding or suppression" of the videotapes constituting spoliation. Id. at 1. The Court received defendant's opposition to the motion ("Def.'s Brief"). [Doc. No. 69]. The Court also heard oral argument. For the reasons to be discussed, plaintiff's motion is DENIED.

Background

Plaintiff commenced the present action on March 12, 2012, asserting claims against defendant pursuant to the Emergency Medical Treatment and Labor Act ("EMTLA") 42 U.S.C. § 1395dd. See generally Complaint [Doc. No. 1]. Plaintiff alleges that on the night of December 21, 2011, he was transported by ambulance to defendant's Washington Township, New Jersey, hospital after experiencing severe rectal pain and trouble breathing. Id.; see October 17, 2013, "Pl.'s December 23, 2011, Email". Plaintiff alleges that at some point during his visit to defendant's hospital, he was "incoherent and in excruciating pain" and wandered into the emergency room lobby where he collapsed onto the floor and "was left lying on the floor for more than ten minutes, while staff walked over him without offering any assistance." Id.[2] Plaintiff claims that after he was eventually

---

[2] At oral argument, plaintiff clarified the timeline of his allegations. Plaintiff recalled waiting in defendant's emergency room at least two hours after arriving at the hospital before he was placed in a "cubicle", where he claims he waited for "three to four hours without them not [sic] doing anything to me." November 21, 2013, Transcript of Oral Argument ("Tr."), at 38:1-

sent to a treatment room, he waited for hours without receiving pain medication or medical attention. Id. Plaintiff alleges that once the treating physician and nurses arrived, they were reluctant to touch him and one nurse left the room "gagging" because of his condition, which caused him "embarrassment, emotional stress, and extreme humiliation". Id. The gravamen of plaintiff's complaint is that defendant "delayed and refused to treat the plaintiff" after learning that he did not have insurance. Id.

On December 23, 2011, the day after his hospital visit, plaintiff sent an email to Renae Alesczyk, an assistant to the Senior Vice President of Kennedy Health System, complaining about his alleged experience at the hospital. See Pl.'s December 23, 2011, Email; October 17, 2013, Letter at 5. In the email,

---

7 [Doc. No. 88]. Plaintiff explained that due to the severity of his pain, he eventually left the cubicle to walk outside of the emergency room into the lobby area to call someone to bring him to another medical facility. Id. at 38:8-18.

    Plaintiff claimed that he did not remember anything but "waking up by the telephone and watching medical staff go by [him] and not even stop to see whether [he] was dying." Id. at 38:19-21. Plaintiff stated that after he woke up he saw "white coats passing by [him] – two of them right next to [him]. They never stopped to see if [he] was having a heart attack, to see if [he] needed prompt medical attention. They never stopped to ascern [sic] what was wrong with [him] whatsoever . . . ." Id. at 37:1-6.

    Plaintiff claims that he was eventually helped into a wheelchair by a hospital employee and wheeled back into the emergency room, where he was allegedly told by hospital staff that he needed to be readmitted because he left his cubicle. Id. at 38:24 to 39:7.

plaintiff described the circumstances surrounding his collapse in the lobby as follows:

> The pain became so bad, I thought I was losing my mind, I was determined to do something. I went to the bathroom although it was agonizing I mad[e] it holding onto the wall, a nurse who saw me struggling helped me back to the room, I lay there for another 30 minutes or so, when I dec[i]ded if I was to get no relief, there was no need in being there, I struggled to get up and walk, made it to the lobby, called my girlfriend and after that I don't know what happened, I woke up on the floor where I laid for 5 minutes . . . . .

Id. In the email, plaintiff stated, "[t]his correspondence shall serve as my notification of my intent to sue your hospital, Dr. Constantine Tsgratos and Nurse Diana Hollop for discrimination and their unfair and inhumane treatment of me while in your hospital, and for pain and suffering." Id. Plaintiff added that "[t]he outcome of the lawsuit really doesn't matter to me . . . [y]ou can reach me at [phone number] if you so choose, if not see you in court." Id.

While defendant initially asserted that it "could not reasonably foresee that [p]laintiff intended to sue" in the months following plaintiff's December 23rd email (see Def.'s Brief at 17-18), in a letter dated October 17, 2013, defense counsel submitted to the Court newly discovered email correspondence between hospital staff that sheds light on how defendant perceived plaintiff's threat of litigation. The emails reveal that only hours after plaintiff emailed his grievance to

4

Ms. Alesczyk, Aron Berman, formerly employed as defendant's Director of Guest Relations and Service Improvement, forwarded plaintiff's email to Kim Hoffman, defendant's Corporate Director of Patient Safety Risk Management. Mr. Berman's email posed the following question, "[e]arly alert . . . [p]lease advise how to proceed. Follow standard grievance response protocol or do not respond due to threat of litigation?" <u>See</u> October 17, 2013, Letter at 11. In her reply dated December 27, 2011, Ms. Hoffman stated:

> My concern with this one is meeting the CMS requirement as well as the <u>litigation potential</u>. This was sent to many people and the response needs to be a coordinated one by one person. Did Kathy [Tregear] speak with the patient? Not sure but it needs to follow the normal protocol.

<u>Id.</u> (emphasis added).[3]

Upon Ms. Hoffman's recommendation, Mr. Berman contacted plaintiff by letter dated December 27, 2011, apologizing for "the experience [plaintiff] described, and for failing to meet [plaintiff's] expectations." <u>See</u> October 17, 2013, Letter at 14. Mr. Berman also informed plaintiff that both the "Nurse Manager

---

[3] At oral argument, Ms. Hoffman clarified that her concerns regarding the "CMS requirement" related to the hospital's compliance with CMS regulations for responding to patient grievances. According to Ms. Hoffman, the hospital was required to conduct an investigation into the patient's allegations, provide an acknowledgement that the hospital received the patient's allegations, and provide a response back to the patient based upon the findings of the investigation. Tr. at 44:12-20.

[Alice Farrell] and Medical Director [Dr. Thomas Wetjen] of the Washington Township Emergency Department" were in the process of "investigating and following up on the issues" identified in plaintiff's email, promising to respond within thirty days. According to Ms. Hoffman, Mr. Berman opened an investigation into plaintiff's allegations seeking input from clinical staff regarding the treatment plaintiff received. Tr. at 51:7-10. Ms. Hoffman testified that the investigation focused specifically on the "clinical care that was given to plaintiff" because "that was what was outlined primarily in the [plaintiff's email]." Tr. at 51:21 to 52:1. At the conclusion of defendant's investigation, Mr. Berman contacted plaintiff by letter dated January 25, 2012, to notify him that "[t]he outcome of [the] investigation showed that the care [plaintiff] received was appropriate." October 17, 2013, Letter at 15; January 25, 2012, Berman Letter. Plaintiff responded by sending a letter dated February 11, 2012, advising defendant of his intention to file a lawsuit based upon the following claims:

> discrimination, physical, mental and emotional distress, for an incident that happened in Dec[ember] of 2011, where I was left in a room without pain medication or care for over seven hours . . . humiliated and embarrassed by [defendant's] staff['s] attitude and neglect . . . [and] disparaging treatment against those who have no insurance or are of a minority . . . .

Id. at 17; February 11, 2012, "Tort Claims Notification" Letter. Plaintiff subsequently filed his complaint on March 12, 2012.

During the course of discovery, plaintiff requested that defendant produce videotape footage covering the hospital's emergency room lobby on the night the alleged incident occurred. However, defendant informed plaintiff on two different occasions that "no video tape evidence of his visit to the emergency room on December 21 and December 22, 2011 existed after January 11-12, 2012." Def.'s Brief at 15-16. Defendant asserts that it explained to plaintiff that "due to limited hard drive space, video tape evidence is erased approximately twenty-one (21) days following the date of a recording." Id. Thereafter, plaintiff filed the present motion seeking sanctions against defendant for its alleged spoliation of emergency room videotapes from the night plaintiff's action arose. Plaintiff argues that defendant "knew or should have known that maintaining records, tapes, video[s] . . . is required and that destruction of such items whether inadvertent or intentional is subject to sanctions . . . ." Motion at 2. Plaintiff asserts that "[t]he evidence destroyed jeopardizes [the] chances of [p]laintiff proving his allegations, and would have been good for the [plaintiff] [sic] which is why [defendant] destroyed it . . . ." Id.

In opposition, defendant initially argued that sanctions for spoliation should not be imposed because defendant "did not

know and could not reasonably foresee that [p]laintiff intended to sue in the coming months," while asserting that the "destruction of [the videotapes] was simply the result of [d]efendant's established routine." Def.'s Brief at 17-18. However, in light of defendant's recent document production revealing that it was, in fact, aware of plaintiff's intent to sue weeks before the tapes were set to be taped over, defendant has tailored its argument to dispute the "nature and focus of threatened litigation." Tr. at 41:9-10. At oral argument, defense counsel proffered that from the hospital staff's perspective, the crux of plaintiff's email was that "he was not provided treatment and he was not treated properly and that . . . [hospital personnel] saw it as someone who was claiming that because he was uninsured that he was being discriminated against, who was complaining of severe pain and was not being treated either through medication or otherwise in the treatment area . . . ." Tr. at 42:1-7. Defense counsel argued that defendant's investigation into plaintiff's allegations did not include an inquiry into plaintiff's alleged collapse in the emergency room lobby because plaintiff never specifically alleged sustaining a "fall" and never claimed to have suffered an injury in the lobby. Defense counsel argued that the hospital's investigation revolved around plaintiff's EMTLA claim

and the events that allegedly occurred within the treatment room. Tr. at 41:23-25, 42:22-25.

Ms. Hoffman testified that while she had the authority to make a request to save the tapes before they were overwritten, she did not do so because she believed plaintiff's complaint was based upon the clinical care he received in the treatment area, which is not covered by video cameras. Tr. at 45:13-21. Ms. Hoffman explained that "[she] immediately checked to see if there was an incident report. Security would have documented an occurrence in the incident report system. There was not, so [she] had no reason to believe that anything occurred in the lobby that would require [her] to sequester the tape." Tr. at 46:3-7. When asked by the Court to identify circumstances that warrant the preservation of videotape footage, Ms. Hoffman explained that she would request videotape from security if someone were injured in a slip and fall or if a physical assault took place in the emergency room lobby. Tr. at 46:20-25.

Defense counsel also proffered testimony on behalf of George Crocker, defendant's Security Lieutenant, representing that while there are video cameras located in the emergency room lobby area, in the drop-off area for emergency vehicles, and in the emergency room proper, none of the treatment areas are filmed because of privacy laws. Tr. at 59:12 to 60:16. Defense counsel further proffered that the hospital currently uses the

same digital video recording system that was in place on the night of plaintiff's visit, explaining that the system has a digital video hard drive "which only has capacity for about 21 days of video [retention] and for that reason, after 21 days it will re-loop and it will simply ta[p]e over and that is how [defendant] [has] done this in the regular course of business for years." Tr. at 60:14-20.

In considering plaintiff's present motion, the Court will decide whether plaintiff's December 23, 2011 email threatening litigation triggered defendant's duty to preserve the emergency room videotapes. Specifically, the Court must determine whether defendant should have foreseen that plaintiff would seek the production of the videotapes to support his claims. Furthermore, the Court will determine whether plaintiff satisfied his burden of proving defendant acted in "bad faith" in allowing the videotapes to be taped over. For the reasons to be discussed, plaintiff's motion is denied.

Discussion

A claim for spoliation requires that the Court conduct a two part inquiry. The Court must first determine whether defendant's conduct constitutes spoliation. Lucia v. McClain & Co., Inc., No. 11-930 (CCC/JAD), 2013 WL 4517976, at **1, 8 (D.N.J. Aug. 23, 2013). If the Court finds that a party has engaged in spoliation, it must next consider the appropriate

sanctions available to redress the situation. Id. Spoliation is "'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Kachigian v. Berkshire Life Ins. Co. of America, No. 09-6217 (DEA), 2013 WL 1338288, at **1, 2 (D.N.J. Apr. 1, 2013) (internal citations omitted). The Third Circuit has adopted a four-factor test for evaluating spoliation claims, finding that spoliation occurs where: "(1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party." Bull v. United Parcel Service, 665 F.3d 68, 73 (3d Cir. 2012). "The party who seeks a spoliation sanction bears the burden of proving these factors." Kachigian, 2013 WL 1338288, at *2.

In the present action, neither party contests the fact that defendant was in possession and control of the emergency room videotapes at the time they were taped over. Defendant submits that the videotapes cannot be produced and no longer exist after being taped over as a matter of routine and in accordance with its video retention policy on approximately January 11 or 12, 2012. Def.'s Brief at 6. The Court accepts defendant's

submission that it no longer possesses the videotapes at issue, and thus proceeds to the relevance analysis.

As to the relevance of the tapes, plaintiff claims that the tapes would have shown hospital staff walking past him as he lay unconscious on the lobby floor. Plaintiff argues that the footage was relevant to show that he was subjected to discrimination and "inhumane" treatment while in defendant's care. In opposition, defendant argues that plaintiff ultimately filed a complaint asserting an EMTLA claim, claiming that defendant failed to perform a medical screening examination in a timely fashion and accusing his treating nurses and physicians of inappropriate behavior. Tr. at 41:10-13. Defendant argues that the complaint is rooted in allegations that defendant failed to provide proper medical care and discriminated against plaintiff for being uninsured, not "that there was an injury that was caused by an event in the lobby." Tr. at 42:22-24.

While the Court is left to speculate as to what the videotapes may or may not have shown had they not been taped over, assuming arguendo that the tapes depicted defendant's staff walking past plaintiff as he lay unconscious on the floor, the Court finds that such evidence would be relevant to plaintiff's claims. By presenting video footage capturing defendant's alleged indifference towards plaintiff, plaintiff could argue that he was ignored because he was uninsured. Thus,

the Court finds that the videotapes were or could have been relevant to plaintiff's claims.

With respect to a party's duty to preserve, it is well settled that a litigant has an obligation "'to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation.'" Fairview Ritz Corp. v. Borough of Fairview, No. 09-0875, 2013 WL 163286 at **1, 4 (D.N.J. Jan. 15, 2013) (quoting Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. 2000)). The Third Circuit has held that the question of reasonable foreseeability is "'a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad [of] factual situations inherent in the spoliation inquiry.'" Bull, 665 F.3d at 78 (internal citations omitted).

In light of defendant's recent production of documents showing that it was aware of plaintiff's intent to sue prior to the taping over of its video, the Court must now consider defendant's argument that the tapes were not preserved because the hospital staff believed plaintiff's grievances were directed at the clinical treatment he received. A review of the recently produced email exchanges between defendant's staff reveals that plaintiff's December 23, 2011 email was circulated to a number of hospital administrators before the videotapes were taped over. More importantly, the emails show that Ms. Hoffman, an

13

administrator with the authority to preserve the videotapes, acknowledged the "litigation potential" of plaintiff's grievance as early as December 27, 2011, roughly two weeks before the tapes were taped over. See October 17, 2013, Letter at 11; Dec. 27, 2011, Hoffman Email. The record also indicates that on January 30, 2012, soon after the subject videotape was taped over, emails were exchanged between Mr. Berman, Dr. Thomas Wetjen (Emergency Department Medical Director), and Alice Farrell (Emergency Department Nurse Manager) discussing plaintiff's behavior, the treating staff's conduct, and the clinical care provided to plaintiff. Id. at 12. However, the Court notes that none of the emails reference plaintiff's alleged "fall" in the lobby or his allegation that the staff ignored him as he lay on the floor. The absence of discussion regarding plaintiff's alleged "fall" in the lobby supports Ms. Hoffman's testimony that the investigation into plaintiff's grievance was focused on the clinical care he received.

After considering the totality of the circumstances surrounding plaintiff's December 23, 2011 email, the Court finds that it was not unreasonable for defendant to believe that plaintiff intended to sue based on his complaints about the clinical care provided in his treatment room, which was

allegedly motivated by the fact that he did not have insurance.[4] The emergency room videotape is not relevant to this complaint. The Court agrees that the focus of plaintiff's December 23, 2011 email was that he was provided substandard medical care and treated poorly by defendant's staff because he was uninsured. Furthermore, as defendant noted, plaintiff did not claim to have suffered an injury as a result of his alleged collapse in the lobby, a claim that would have likely prompted Ms. Hoffman to ask security to preserve the video. Tr. at 53:9-16. While it is clear that plaintiff's December 23, 2011 email triggered defendant's duty to preserve relevant evidence concerning plaintiff's claims for substandard medical care, the Court finds that prior to the January 11/12, 2012 tape-over of the emergency room tapes, it was not reasonably foreseeable that the videotapes would be requested in connection with the claims raised in plaintiff's email. This is due to the fact that the focus of plaintiff's litigation threat was directed to his medical treatment or lack thereof, not what happened in the emergency room lobby.

---

[4] The December 23, 2011 email is critical because it was the only correspondence plaintiff sent to defendant regarding the alleged incident prior to the videotapes being taped over. Although the date of at least one of plaintiff's written communications to defendant is unclear, the Court's ruling would not change even if it was sent before January 11-12, 2012. All of plaintiff's communications focus on his medical treatment, and not what happened in the emergency room.

As a result, the Court finds that defendant's duty to preserve the videotapes did not arise before January 11 or 12, 2012. While the Court does not have to determine the exact date the duty to preserve the emergency room videotapes arose, it finds that the duty arose after the tapes had already been taped over as a matter of routine. See Kachigian, 2013 WL 1338288, at *3.

To complete the spoliation analysis, the Court addresses the issue of whether the tape-over of the videotapes was done in "bad faith." The Third Circuit held in Bull that "a finding of bad faith is pivotal to a spoliation determination." Id.[5] The Court's ruling made it clear that "actual suppression requires

---

[5] In Bull, the Third Circuit revisited its holding in Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995), where the court addressed the connection between sanctionable spoliation and a finding of bad faith, stating the following:

> For the spoliation rule to apply . . . it must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. See generally 31A C.J.S. Evidence § 156(2); 29 Am. Jur. 2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.").

Bull, 665 F.3d at 79 (quoting Brewer, 72 F.3d at 334).

more than ordinary negligence." Lucia, 2013 WL 4517976, at *16 (quoting Kachigian, 2013 WL 1338288, at *4). After Bull, in order to make a showing that evidence was withheld in bad faith, the party who seeks a spoliation sanction bears the burden of proving intent. Id.; see also U.S. v. Nelson, 481 Fed. Appx. 40, 42 (3d Cir. 2012) ("[W]here there is no showing that the evidence was destroyed in order to prevent it from being used by the adverse party, a spoliation instruction is improper.").

In Kachigian, a case involving a breach of contract claim based on the defendant's denial of the plaintiff's claim for disability benefits, the defendants sought the production of logs, appointment books, schedules and calendars allegedly kept by the plaintiff documenting his daily occupational duties. However, the plaintiff claimed that he was no longer in possession of the logs because he turned them over to his former employer and business partner as part of a transfer of ownership agreement. After the plaintiff's former business partner produced the documents in response to the defendant's subpoena, the defendants claimed that the logs were incomplete and filed a motion in limine requesting that the court dismiss the plaintiff's claims, bar the plaintiff from presenting evidence that he performed certain occupational duties, or issue an adverse inference instruction to the jury. Kachigian, 2013 WL 1338288, at **1-3.

In applying the spoliation analysis set forth in <u>Bull</u>, the Court determined that the evidence was relevant and that by turning over the logs pursuant to the transfer of ownership agreement, the plaintiff no longer controlled the evidence. <u>Id.</u> at *2. The court also considered the issue of whether it was "objectively foreseeable" to the plaintiff that future litigation was likely prior to the transfer of the logs, concluding that the duty to preserve arose after the logs had been transferred. <u>Id.</u> at *3. Lastly, in finding that no actual suppression or spoliation occurred, the court explained that "the record [did] not demonstrate any bad faith or intent on the part of the [p]laintiff to withhold the documents," because it "seem[ed] likely the logs were simply misplaced or lost after they were delivered to [plaintiff's former business partner]." <u>Id.</u> at *4.

Similar to <u>Kachigian</u>, this Court finds no evidence suggesting that the emergency room videotapes were taped over in bad faith or with the intent to destroy relevant evidence. Moreover, the Court finds that prior to the videotapes being taped over, it was not "objectively foreseeable" to defendant that the videotapes from the emergency room lobby were relevant to plaintiff's claim regarding substandard medical care. <u>See</u> <u>id.</u> at *3. Defendant does not dispute that it was responsible for taping over the emergency room videotapes, nor does it dispute

the fact that it knew the tapes would be taped over as a matter of routine twenty-one days after the date of recording. Defendant's documents show that it was on notice of the litigation potential stemming from plaintiff's visit to its hospital weeks before the tapes were taped over. However, while defendant "knowingly" taped over the videotapes by virtue of maintaining a video retention system that automatically tapes over its contents after three weeks, the Court finds that defendant did not do so in bad faith or with the intent to deprive plaintiff of access to the footage. There is no evidence to indicate that defendant's employees knew or anticipated that plaintiff's claims would require the retention and production of emergency room videotape footage from the night plaintiff was treated. After reviewing the email exchanges between hospital administrators and hearing Ms. Hoffman's testimony, the Court finds that defendant's failure to preserve the tapes is attributable to the fact that defendant reasonably believed that the scope of plaintiff's grievances concerned the standard of medical care he received.

The Court finds that plaintiff has failed to establish that defendant acted in bad faith by allowing the tapes to be automatically taped over as a matter of routine, and has offered no evidence to show defendant suppressed the tapes in order to deprive him of access to relevant evidence. Therefore, absent a

showing of bad faith, the Court cannot find that defendant's conduct constitutes spoliation under Bull. See Lucia, 2013 WL 4517976, at **15-16 (finding no spoliation occurred as defendant failed to establish that plaintiff acted in bad faith when he inadvertently lost relevant logbooks).

In sum, the Court does not find that defendant's conduct amounts to spoliation. While plaintiff's December 23, 2011 email triggered defendant's duty to preserve materials related to his claim for substandard clinical care, the Court finds that it was not reasonably foreseeable to defendant that plaintiff would eventually request the production of emergency room videotapes from the night of his hospital visit. Defendant was reasonable in operating under the belief that plaintiff's claims arose out of the medical care he received or did not receive in the treatment room, an area that is not covered by cameras. Furthermore, plaintiff did not allege that he sustained an injury as a result of his "fall", and thus Ms. Hoffman, hospital security, and other administrators had no reasonable basis to believe that a request to retain the emergency room videotapes was necessary.

In addition, the Court finds that plaintiff has failed to satisfy his burden of proving defendant acted in bad faith. In the wake of the Third Circuit's decision in Bull, a party seeking to impose sanctions for spoliation bears the burden of

proving that the suppression of evidence was done in bad faith. Given that plaintiff has made no such showing, the Court finds that spoliation did not occur.

Conclusion

Accordingly, for all the foregoing reasons,

IT IS hereby ORDERED this 24th day of January, 2014, that plaintiff's "Motion for Sanctions Due to Defendant['s] Spoliation of Emergency Room Video Tapes" is DENIED.


/s/ Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Date: January 24, 2014